**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

04 10022 JLT

| | |
|---|---|
| EDWIN POWELL MILLER, Individually and On Behalf of All Others Similarly Situated, | ) ) **CIVIL ACTION NO. _____** |
| | ) |
| Plaintiff, | ) **MAGISTRATE JUDGE** Collings |
| | ) |
| vs. | ) CLASS ACTION COMPLAINT |
| | ) FOR VIOLATIONS OF |
| NETWORK ENGINES INC., JOHN CURTIS, | ) FEDERAL SECURITIES LAWS |
| DOUGLAS G. BRYANT and LAWRENCE A. | ) |
| GENOVESI, | ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |
| | ) |

Plaintiff alleges the following based upon the investigation of counsel, including review

of United States Securities and Exchange Commission ("SEC") filings by Network Engines, Inc.

("Network Engines" or the "Company"), regulatory filings and reports, securities analysts' reports and

advisories about the Company, press releases and other public statements and representations issued

by the Network Engines, and news media reports about the Company.   Plaintiff believes that

substantial additional evidence supporting the allegations set forth herein will be uncovered after a

reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of Network

Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period"), seeking

to pursue relief under the Securities Exchange Act of 1934 (the "Exchange Act").

AMOUNT $160    52961
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK  form
1/7/05

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the

Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§ 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28

U.S.C. § 1391(b), as and many of the acts and practices complained of herein occurred in substantial

part in this District.

5.      In connection with the acts alleged herein, defendants, directly or indirectly, utilized the

means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate

telephone communications and the facilities of national securities markets.

## PARTIES

6.      Plaintiff Edwin Powell Miller, as set forth in the accompanying certification,

incorporated by reference herein, purchased the securities of Network Engines during the Class Period

at artificially inflated prices, and has suffered damage thereby.

7.      Defendant Network Engines is a Delaware corporation founded in 1997 with its

principal place of business at 25 Dan Road, Canton, MA 02021. Network Engines is a company

which provides server appliance hardware and custom integration services. Network Engines

describes itself as a "leading development, manufacturing and distribution partner for storage and

security software and network equipment providers." The Company focuses on fostering and

2

developing partnerships with independent software vendors (ISVs) and original equipment

manufacturers (OEMs) to furnish these partners with server appliance hardware, integration services

and appliance development, deployment and support to allow these partners to deliver storage and

security networking solutions to end user customers.

8. Defendant John Curtis ("Curtis"), was at all relevant times Network Engines's President

and Chief Executive Officer.

9. Defendant Douglas G. Bryant ("Bryant") was at all relevant times Network

Engines's Chief Financial Officer ("CFO") and Vice President of Finance and Administration.

10. Defendant Lawrence A. Genovesi ("Genovesi") is a founder of the Company and

was at all relevant times the Chairman of its Board of Directors. Genovisi previously served as the

Company's President, Chief Executive Officer and Chief Technology Officer. During the Class Period,

defendant Genovesi sold 75,000 shares of his personally-owned Network Engines stock at artificially

inflated prices for gross proceeds of about $783,300.

11. Defendants Curtis, Bryant and Genovesi are collectively referred to hereinafter as the

"Individual Defendants."

12. Because of the Individual Defendants' positions with the Company, they had access and

were privy to adverse undisclosed information about the Company's business, operations, operational

trends, financial statements, markets and present and future business prospects. The Individual

Defendants had access and were privy to this information as a result of their access to internal

corporate documents (including, inter alia, Company operating plans, budgets and forecasts and reports

of actual operations compared thereto), conversations and connections with other corporate officers

3

and employees, attendance at management and Board of Directors meetings and committees hereof and via reports and other information provided to them in connection therewith.

13.    It is appropriate to treat the Individual Defendants as a group for pleading purposes, and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other public statements, as alleged herein, are the collective actions of the group of defendants identified above.  Each of the above Company officers, by virtue of their high-level positions with the Company, directly participated in the managing of the Company, was directly involved in the Company's day-to-day operations at the highest levels, and was privy to confidential proprietary information concerning the Company as well as its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, editing, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements alleged herein were being issued regarding the Company, and approved or ratified these statements, in violation of federal securities laws.

14.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price

4

of the Company's publicly-traded securities would be based upon complete, truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period, alleged herein, violated these specific requirements and obligations.

15.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Due to their Board membership and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects and financial condition and performance as set forth herein, and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading

16.    Due to their positions of control and authority as officers and/or directors of the Company, the Individual Defendants were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or the opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant bears responsibility for the accuracy of the public reports and releases listed and described herein and therefore bears primary liability for the representations contained therein.

5

17.    Each of the defendants bears liability for participating in a fraudulent scheme and course of conduct and business that operated to defraud or deceive purchasers of Network Engines securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  In particular, this scheme:

(i) deceived the investing public regarding Network Engine's business, operations, management and the intrinsic value of Network Engines stocks;

(ii) enabled defendant Genovesi to sell 75,000 shares of his personally-owned Company stock at artificially inflated prices for gross proceeds of approximately $783,300, and

(iii) caused plaintiff as well as other Class members to purchase Company stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Network Engines during the Class Period and who were damaged thereby.  Excluded from the Class are the defendants, the Individual Defendants' immediate families as well as their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable.  As of July 31, 2003, there were 34,254,308 shares of the Company's common stock outstanding.  Throughout the Class Period, Network Engines common shares were actively traded on the NASDAQ.  While Plaintiff cannot at this time identify with precision the number of Class members, and

6

that number can only be ascertained through appropriate discovery, plaintiff believes that there are

hundreds if not thousands of members in the proposed Class. Record owners and other members of

the Class may be identified from records maintained by Network Engines or its transfer agent and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily

used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the other Class members, as all members of

the Class are and have been similarly affected by defendants' wrongful conduct in violation of federal

law, as complained of herein.

21.     Plaintiff will fairly and adequately represent and protect the interests of the members of

the Class, and Plaintiff has retained counsel highly competent and experienced in class and securities

litigation.

22.     Common questions of law and fact exist as to all Class members, and these common

questions predominate over any questions solely affecting individual Class members. Among these

common legal and factual questions are:

        i. whether defendants' conduct as alleged herein violated the federal securities laws;

        ii. whether defendants' statements and representations to the investing public during the

Class Period misrepresented material facts about the business, operations and management of

the Company; and

        iii. to what extent the Class members have sustained damages, and the proper measure

of such damages.

23.     A class action is superior to all other available methods for the fair and efficient

7

adjudication of this controversy, since joinder of all Class members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done

to them. There will be no difficulty in managing this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     Network Engines is a company which provides server appliance hardware and

custom integration services. Network Engines describes itself as a "leading development,

manufacturing and distribution partner for storage and security software and network equipment

providers." The Company focuses on fostering and developing partnerships with independent software

vendors (ISVs) and original equipment manufacturers (OEMs) to furnish these partners with server

appliance hardware, integration services and appliance development, deployment and support to allow

these partners to deliver storage and security networking solutions to end user customers. Network

Engines became a public company in mid-2000 and, shortly thereafter, suffered a decline in a

substantial portion of its business when the internet stock boom came to an end.

25.     In late 2001, Network Engines entered into a lucrative and successful

manufacturing deal with EMC Corporation ("EMC") to build the Company's Centera product. This

Centera contract would soon afterward account for approximately one-half of the Network Engines'

revenue. Centera was designed for storing fixed content, such as medical records and e-mail

messages. Centera was introduced just as health care and securities regulations began to increase,

generating great demand for such a data storage platform.

8

26.    In November 2002, Network Engines acquired a company called TidalWire, Inc. ("TidalWire"), allowing Network Engines to expand its business to distribution. TidalWire focuses on the distribution and support for storage networking and has had substantial success distributing Host Bus Adapters (HBAs), which are cards that connect data storage systems to computer networks. By acquiring TidalWire, Network Engines was able to expand the scope of its relationship with EMC by distributing HBAs to EMC.

27.    By the start of the Class Period on November 6, 2003, defendants knew, but failed to disclose, that Network Engines was in the process of renegotiating its distribution contract with EMC, and that EMC was demanding price reductions, which, if agreed to, would have a negative effect on Network Engine's future financial results. Despite this, throughout the Class Period, defendants issued positive statements highlighting the Company's strong financial performance, continued growth and its purportedly successful relationship with EMC, its largest customer.[1]  Defendants failed to disclose, however that:

(i) the Company was in the process of renegotiating its distribution contract with EMC;

(ii) in connection with said renegotiation of the distribution contract, EMC was insisting on price concessions to square its agreement with the Company with the pricing that Network Engines was providing for other customers;

_____

[1]    Because the Company apparently has a policy of not identifying certain of its customers, the Company refers to EMC not directly by name, but rather as Network Engine's "largest" customer.

9

(iii) the new renegotiated EMC distribution contract would have a negative ef ct on the Company's future financial performance;

(iv) the Company would not be able to sustain its growth in gross margins as a result of the renegotiated EMC distribution contract; and

(v) as a result, the Network Engines' positive statements issued during the Class Period were materially false and misleading when made.

28.    On December 10, 2003, the Company announced, <u>inter alia</u>, that it had renegotiated its distribution contract with EMC and that the renegotiated contract would have a negative effect upon both the Company's gross profit generated from the sale of EMC-approved HBAs, as well as the gross profit from the Company's distribution operations.

29.    After this announcement was made, the market price of shares of Network Engines common stock plunged $3.92 per share, or 39%, to close at $6.10 per share, on extremely high trading volume. The Company's share price has continued to fall since that time.

## Materially False and Misleading
## Statements Made During the Class Period

30.    The Class Period opens on November 6, 2003, when the Company issued a news release announcing its financial results for the fiscal fourth quarter and full year 2003. In that news release, Defendant Curtis commented on the Company's "solid" performance, stating, in pertinent part, that:

> <u>The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines.</u>
> <u>Our results reflect the continuing success of our business strategy. We are seeing</u>
> <u>increasing acceptance of our unique value proposition by our customers and software</u>
> <u>partners.</u> We recently announced new application partners, including KVS, Inc.,

10

> Computer Associates International, Inc. and CommVault Systems, Inc., that we will work with to develop and distribute server appliances into our customer base of over 400 channel customers in the growing storage and security networking markets.
>
> [Emphasis added.]

The November 6 news release also commented on the Company's relationship with its current customers, stating, in part, that:

> Additionally, the Company continued to develop its relationships with new partners <u>a d strengthen relationships with existing partners</u>. [Emphasis added.]

31.     A November 6, 2003 <u>Dow Jones News</u> article headlined "Network Engines/ Earnings/Outlook -2: Cites Co. Turnaround" reiterated the claims in the Company's November 6 new release, stating that "Network Engines said its results reflect a turnaround for the company and the continued success of its business strategy, as well as the addition of new partners."

32.     In a conference call with investors later on November 6, 2003, defendants Curtis and Bryant commented on the Company's financial performance. Near the end of the call, defendants Curtis and Bryant responded to a series of questions by the participants on the call. During the call, Defendant Curtis commented positively concerning the Company's positioning for future growth as well as the success of the Company's TidalWire acquisition. Defendant Curtis stated, in relevant part, that:

> As we have said previously, we believe that there is a trend towards the convergence of storage and security applications and we believe that <u>we have positioned the company to address the growing demand for network appliance solutions in these markets</u>.
>
> <u>We consider our acquisition of TidalWire to be a core success for our company. In our Q4, we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution operation</u>. [Emphasis added.]

*     *     *     *

11

> Furthermore, we are optimistic that in coming quarters, there will be more opportunit es to partner with existing and the newly signed software companies to develop, market and distribute new appliances into the storage and security markets. [Emphasis added ]

During the November 6 conference call, Defendant Curtis further commented on the success of

TidalWire, stating, in relevant part, that:

> We have added a highly qualified distribution, sales, marketing and logistics team fro 1 TidalWire, along with their state-of-the-art CRM and logistic systems and equally important, a channel of over value-added resalers, resellers and systems integrators.

> 33.    Additionally, defendant Bryant made several positive representations concerning

the Company's performance and its future prospects during the November 6 call.  Defendant Bryant

represented that

> Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, the distribution business contributed 19.8% gross margin, while the OEM appliance business contributed 21.3% gross margins.

> The entire 14.2% gross margins from fiscal 2002 were generated exclusively by our OEM appliance business as we had not yet acquired TidalWire, which occurred at the end of the first fiscal quarter of 2003. [Emphasis added.]

Defendant Bryant also commented on the dramatic drop in the Network Engine's net losses, s ating

that:

> This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire and the growth in our OEM appliance business, while maintaining control over our operating expenses. [Emphasis added.]

Defendant Bryant then responded to certain questions near the conclusion of the call.  When Bryant

was asked if EMC, the Company's largest OEM client, was pressuring Network Engines for more

aggressive product pricing, he responded as follows:

12

OMAR ALMADANNI (ph), ANALYST, SOUNDVIEW: Yes, good morning. Just a question on your largest OEM customer here, from my rough estimate, it looks like it dropped about 7% sequentially in terms of revenues, but you know, that customer had mentioned qualitatively that they saw pretty strong sequential growth in that specific product line.

So I guess the question here is you know, what is the delta coming from, is the, is this customers diversifying to another manufacture, are they pricing more aggressively with you, or you know, how much of that is due to the perhaps consignment issue?

DOUG BRYANT: Omar (ph) , I think, this is Doug. I think we've stated in the past that, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it. And it's just really tough to do any kind of correlation, you know, the fact that we talked about we changed the way, you know, going from that, going to that consignment inventory situation, you know, that certainly had an impact on it, but other than that, you know, we, you have to talk to our partner about any other questions.

OMAR ALMADANNI (ph): I mean, would you be able to comment on whether that specific partner is diversifying?

DOUG BRYANT: We can't speak for them.

OMAR ALMADANNI (ph): You can't, OK.

DOUG BRYANT: You should talk to them about that.  [Emphasis added.]

34.     The statements referenced above in ¶¶ 30 and 31 were each materially false and misleading when made, because they did not disclose and/or misrepresented, inter alia, the following adverse facts:

(i) that the Company was in fact in the process of renegotiating its distribution contract with EMC;

13

(ii) that in connection with the renegotiation of that contract EMC was demanding price concessions to square its agreement with Network Engines with the pricing that the Company was providing other customers;

(iii) that the new and renegotiated EMC distribution contract would have a depressing effect the Company's future financial performance;

(iv) that the Company would be unable to sustain the growth in its gross margins as a result of the renegotiated and amended EMC contract; and

(v) that as a result, the Company's positive statements and representations issued during the Class Period were materially false and misleading when made.

35.     The Class Period closes on December 10, 2003, when the Company issued another news release announcing that its distribution agreement with EMC had been amended as a result of renegotiation, and that all changes to the EMC agreement would be effective January 1, 2004. The Company admitted that the renegotiated contract "provides for increased costs to network Engines relating to the sale of EMC-approved [HBAs]," and that "because of the amendment, there will be a decline in the gross profit related to the sale of EMC-approved HBAs, which will in turn have a negative impact on the company's distribution operations gross profit. This decline in distribution operations gross profit is expected to have a negative impact on consolidated gross profit and operating margins beginning in the quarter ending March 31, 2004."

36.     Defendant Bryant also disclosed in the December 10 news release that the amended EMC contract will now bring gross profit from the sale of EMC-approved HBAs "more in line with our gross profit on the distribution of other third party storage networking products, which has

14

ranged from 7% to 12% of net revenues." Finally, the Company stated that it was considering whether the amendments to the EMC distribution contract would impair the goodwill and intangible assets associated with the Company's TidalWire acquisition.

37.    Following the issuance of the December 10, 2003 news release, the market price of Network Engines common stock dropped $3.92 per share, or 39%, to close at $6.10 per share on extremely high volume of over 14.396 million shares traded (almost fourteen times the average daily volume). By December 15, 2003, the market price of Company's common stock had plummeted an additional 26.8% to close at $4.46 per share.

38.    The market for Network Engines's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions, Network Engines's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Network Engines' securities in reliance upon the integrity of the market price of those securities and the available market information relating to Network Engines, and have been damaged thereby.

39.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Network Engines's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth and the facts about the Company and its operations and business, as alleged herein.

15

40.    At all relevant times, the material misrepresentations and omissions set forth in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made and/or caused to be made a series of materially false or misleading statements about Network Engines's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Network Engines and its business, prospects and operations, thus causing the Company's securities to be significantly overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements and representations during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

41.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Network Engines, their control over, and/or receipt and/or modification of Network Engines's allegedly materially misleading misstatements and/or their associations with the Company

16

which made them privy and gave them access to confidential proprietary information concerning

Network Engines, participated in the fraudulent scheme and course of conduct alleged herein

42.    Defendants were further motivated to conceal the truth about the Company and its

operations in order to allow defendant Genovesi to sell 75,000 shares of his personally-owned

Network Engines stock at artificially inflated prices and thereby reap gross profits of approximately

$783,300.

43.    Another Network Engines insider, Vice President Jeffrey Brandes, also profited

from the inflated market price of the Company's stock during the Class Period by unloading 9,375

shares for gross proceeds of about $96,470.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

44.    At all relevant times, the market for Network Engines's securities was an efficient

market for the following reasons, among others:

(a)    Network Engines's stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Network Engines filed periodic public reports with the SEC

and with the NASDAQ;

(c)    Network Engines regularly communicated with public investors by way of

established market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

17